Jesse C. CAMPBELL, Max Miller and Fred Miller, d/b/a Miller Feed Service, Appellants,

v.

Charles E. MARKHAM, Appellee.

Court of Appeals of Kentucky.

March 29, 1968.

Frederick E. Nichols, Nichols & Nichols, Madisonville, for appellants.

M. R. Mills, Mills, Spain & Mitchell, Madisonville, for appellee.

PALMORE, Judge.

Appellee, Charles Markham, obtained a verdict and judgment in the amount of $38,473.50 against Jesse Campbell and Campbell's employers for personal injuries and property damages sustained by Markham when a truck driven by Campbell knocked or forced his automobile off the highway. Campbell and his employers, owners of the truck, appeal. They contend that (1) they were entitled to a directed verdict, (2) competent testimony offered in their behalf was improperly rejected, (3) they were entitled to a sudden emergency instruction, (4) they were entitled to an instruction specifically referring to Markham's duties of maintaining a lookout and keeping his car under reasonable control, (5) the instruction defining contributory negligence as to Markham was erroneous, and (6) the award of damages was excessive. Our conclusion is that there was no error.

The accident happened on a straight stretch of U.S. Highway 41 a short distance north of Madisonville. The pavement was 22 feet wide and consisted of two lanes, one for northbound and the other for southbound traffic, divided by a broken white center line. The day was clear, the road was dry, and the time was between noon and 1:00 P.M., March 23, 1962. There was no northbound traffic. At least four vehicles were moving southward. First in line was a car driven by Kyle Corum, then a pickup truck driven by Henry Groves, and then Campbell's tractor-trailer unit. According to all the witnesses except Markham, Markham's Chevrolet automobile was the fourth and last vehicle in the line of traffic. Markham says there was another car, which we shall call car X, between him and Campbell's truck, that car X passed Campbell's truck and he followed suit, and that as he was alongside and in the act of passing the truck Campbell suddenly pulled to his left and the front tires of the trailer unit struck the right front door of the Markham car, which went out of control down the left shoulder of the highway and turned over in a field.

Campbell testified that a short time before the accident he had noticed the Markham car following at a distance of 100 to 150 feet, that there was nothing else between, and that no other vehicle passed his truck. He gave three different versions of the event in a pretrial statement, a pretrial deposition, and his testimony at the trial, but we need not go beyond the latter, in which he described the accident as follows:

A– "Sunshiny day; clear. The vision was good, the road was dry, and I approached this last house out here where Holiday Inn is now, it wasn't there at the time, and as I came over the raise of this hill, I came up behind a pick-up truck which was going down the road ahead of me down through this swag as you leave Holiday Inn, and down about the bridge I seen the stoplight come on on the pick-up, I don't know for how long, but it decreased his speed to which I thought he was stopped—stopping or stopped, but he could have been slowing down to four or five miles an hour. When his stoplight came on, I automatically hit my brakes, I suppose two, maybe three times, but sitting up in my truck, there was nothing coming that I could see, and I just dropped the gears and went on around the pick-up and the car in front of the pick-up. And back about a mile or so down the road I had glanced in my mirror and seen a car behind me. When I went around these two cars down in this swag and was pulling back into my right-hand lane, I remembered that there was a car behind me, and I glanced in my left hand mirror, and at that time is when I seen the Chevrolet turning end over end down in the field south of the bridge."

The highway crosses a small bridge guarded by concrete abutments 22 feet long. The abutments, or bridge rails, are 10 feet off the pavement. A yellow no-passing line for southbound traffic begins at a point about 100 feet north of the bridge and runs southward. There is a dispute as to whether the point of impact was within the yellow line area or north of it. Anyway, Corum, driving the lead vehicle, noticed some stakes set in the field to the left of the highway and decided to stop and look at them. After he cleared the south end of the bridge he pulled off onto the right shoulder and stopped. Groves, behind him, slowed down and also decided to stop. Groves pulled on around the slowing car of Corum and stopped on the shoulder in front of Corum. As his testimony indicates, when Campbell observed these vehicles slowing down in front of him he at first applied his brakes, thus decreasing his speed to some extent, but then decided it would be easier to pass than to stop his heavily loaded truck. There was no oncoming traffic, and Campbell's field of vision was such that he felt it safe to go around even though he realized he would be in the no-passing zone before he could return to the southbound lane. Unfortunately, but admittedly, he did not take the precaution of checking his rearview mirror, for it is clear from the evidence that the Markham car was already in the left-hand lane and in the process of passing his trailer unit.

That there may be no question as to Campbell's actions and the situation with which he was confronted, we quote additional salients of his testimony:

Q– "Now at what point did you go into the left lane?"

A– "As soon as I seen the stoplight come on on the pick-up, I realized he was slowing down and automatically I looked ahead to see if there was any oncoming traffic, which if there was I was going to have to stop. If there wasn't I was going to go on around with the big load, because it is hard to stop."

\*　　\*　　\*　　\*　　\*　　\*

Q– "When you began to swing back into the right hand lane, how far south of the abutment were you?"

A– "I would say two hundred—between two and three hundred feet."

Q– "And then what happened? What did you see then?"

A– "As I was swinging—I looked in my right mirror and seen I was clear of the vehicles I had passed, and I started back into my right lane, and I thought, 'Where was the car that was behind me?' and I looked in my left mirror."

Q– "That is when you saw the new Chevrolet?'

A– "Right."

Q– "Where was it?"

A– "It was on end when I saw it."

Q– "Mr. Campbell, do you know what did happen insofar as the Chevrolet was concerned that day?"

A– "No."

Q– "Did a horn blow?"

A– "No."

\*   \*   \*   \*   \*   \*

Q– "Did you cross the yellow line?"

A– "Yes."

Q– "For what reason?"

A– "The reason was the pick-up and car had slowed down, and *I didn't want to slow down the momentum of my truck unless it was absolutely necessary,* and I glanced ahead and there wasn't nothing coming so I went ahead." [Emphasis added.]

Q– "No other cars passed you on that hill until Mr. Markham started around, if that is what he did?"

A– "No."

Q– "Did you hear a horn out there?"

A– "No."

\*   \*   \*   \*   \*   \*

Q– "You say you had seen this car behind you up there by Holiday Inn?"

A– "I had seen it three or four times."

Q– "You knew there was a car behind you?"

A– "Yes."

Q– "You knew there was a car following you all the way down through there; why did you suddenly remember that car after you had gone out and passed these cars, this pick-up truck and this other car there in the road, why did you suddenly remember the car following you?"

A– "I had to make a decision quick, either to stop or go on, and I just wondered what his decision was, whether he stopped too or come on. That's why I looked."

Q– "That was when you saw him rolling off the road, didn't you?"

A– "Yes, in the field; I didn't see him roll off the road."

Q– "You hadn't seen him when you swung out to pass those cars?"

A– "No."

Q– "You hadn't looked back at all coming off that hill?"

A– "No."

Q– "How far behind were you following that pick-up?"

A– "I come up on him on the hill. I judge I was hundred or a hundred and fifty feet behind him, as he drove down through there."

Q– "You all were going about the same speed?"

A– "Yes."

Q– "When he put his brakes on, he was some hundred or two hundred feet in front of you?"

A– "Yes."

Q– "He came on to a stop, did he now, or you thought he might?"

A– "I thought he might. He could have slowed down to five miles an hour."

Q– "Did you make any effort to try to stop your truck behind him?"

A– "I hit my brakes twice and by that time I seen there was nothing coming and I went on around him."

Q– "How hard did you hit them?"

A– "I don't know."

Q– "You didn't hit them hard enough to lock them or mark the road?"

A– *"No, I didn't have to, I was far enough behind him if I had to stop."* [Emphasis added.]

Q– "You didn't give the man behind you any emergency signals, did you?"

A– "My stoplights."

\*    \*    \*    \*    \*    \*

Q– "You did not look into your rear-view mirror before you swung out to see where this car behind you was?"

A– "No, I didn't."

Markham testified that as he was overtaking the truck Campbell activated his left-turn blinker light, which Markham took to be a signal that it was safe for him to pass. Campbell acknowledged that this signal is sometimes used for that purpose, but denied that he gave it on this particular occasion. He said the only signal Markham could have seen was his brake light. Markham said also that he sounded his horn and that he began his move to pass the truck and the collision occurred at points some distance short of the no-passing zone. However, it is clear that after the impact his car went along the left-hand shoulder and crossed the bridge before going down the embankment to the east of the highway.

The argument that Campbell and his employers should have had a directed verdict rests on the two premises that as a matter of law (1) Campbell was free of negligence and (2) Markham was contributorily negligent.

■ As we have said, the evidence clearly established that Markham was already in the left-hand lane in the process of passing the trailer portion of Campbell's unit when Campbell began his move to pass the pickup truck driven by Groves. The jury could also have accepted Markham's assurance that he had sounded his horn immediately before attempting to pass Campbell, but even if Markham had not done so, certainly Campbell could and should have looked in his rearview mirror to see that the southbound lane was clear of other traffic, both fore and aft. Cf. KRS 189.300, 189.350, 189.380; Carnation Co. v. Devore, Ky., 252 S.W.2d 860, 862–3 (1952); Collett v. Taylor, Ky., 383 S.W.2d 692, 695 (1964); Hainline v. Hukill, Ky., 383 S.W.2d 353, 355 (1964). Unless, as he contends, Campbell was confronted with a sudden emergency, there can be little doubt that the evidence was sufficient to justify a finding that he was negligent.

■ Having thus arrived at the sudden emergency question, we may as well dispose of the argument that Campbell was entitled to an instruction on that theory. To be brief, we think not. Campbell did not claim he cut to the left in order to avoid running into Groves. He knew he had room to stop, but it was not as convenient as it was to go on around. We cannot regard the inconvenience of stopping as a sudden emergency. The trial court did not err in refusing to instruct on the sudden emergency theory. Berry v. Jorris, 303 Ky. 799, 199 S.W.2d 616 (1947), in which the distance between the first two of three vehicles occupying positions comparable to those of Groves, Campbell and Markham was only 25 feet, is distinguishable on the facts.

■ Appellants contend that Markham was negligent as a matter of law in (1)

passing in a no-passing zone,[1] (2) failing to keep a lookout, and (3) failing to have his car under reasonable control. The first of these contentions accords no recognition to Markham's testimony that the collision occurred some 200 feet north of the bridge and 100 feet short of the no-passing zone. Aside from whatever question there may be as to whether a statutory violation in that respect would or would not have been a proximate causal factor in the accident, a directed verdict could not have been proper in the face of conflicting evidence as to whether the violation actually took place.

■ Though Markham's duty of ordinary care included the duties of keeping a lookout and having his car under control, there was simply no evidence that he did not. Therefore, not only was there no basis for a peremptory on such grounds, but also no requirement for an instruction specifically enumerating those duties. The main theory advanced by the appellants in this regard is that Markham should have observed the slowing and stopping movements of the vehicles in front of Campbell's truck. It seems to us, however, that it would be unrealistic and unreasonable to expect a motorist following behind a large tractor-trailer unit on a straight stretch of two-lane, two-way highway to see what is happening so closely in front of the truck as to affect its movement. If a motorist were required to stay so far behind that he could observe conditions immediately ahead of a preceding truck, how would he ever get close enough to pass?

Among the cases cited by appellants on this subject are Dixie Ice Cream Co. v. Ravenna Grocery Co., 306 Ky. 182, 206 S.W.2d 824 (1947); Lexington Roller Mills v. Thornberry, 314 Ky. 111, 234 S.W.2d 491 (1950); Slusher v. Brown, Ky., 323 S.W.2d 870 (1959); Clardy v. Robinson, Ky., 284 S.W.2d 651 (1955); Morrison v. Hibbard, Ky., 375 S.W.2d 685 (1964), and Duncan v. Wiseman Baking Co., Ky., 357 S.W.2d 694 (1962).

In *Dixie Ice Cream Co.,* 306 Ky. 182, 206 S.W.2d 824, only two vehicles were on the highway at the time and in the immediate vicinity of the accident. Truck A backed from the north side of an east-west highway into the south lane and was struck in the rear by truck B, which was approaching from the west. The driver of truck B said his vision was obscured by a dip in the road. There was evidence, however, that he could have seen the movements of truck A from a distance of 600 feet. The parties differed as to whether truck A was entirely in the eastbound lane or, after backing into that lane, had moved forward and swerved into the westbound lane as truck B attempted to pass. In a suit brought by the owner of truck B against the owner of truck A a jury found both drivers negligent. On appeal, the owner of truck B, the plaintiff, contended it was entitled to a directed verdict. In affirming, this court held that the question of contributory negligence was for the jury, and commented that if the view was obstructed it was the duty of the driver of truck B to slow down until he could see. We find nothing inconsistent between that case and this one. The instructions given in this case required Markham (a) to pass to the left of Campbell's truck and not again drive to the right of the center line of the highway until he was reasonably clear of it, (b) to sound his horn before passing, and (c) to exercise ordinary care generally to avoid a collision with other vehicles using the highway at the time and place. Under this instruction the jury had ample guidance and authority for finding contributory negligence on Markham's part and could have come to the same conclusion reached in *Dixie Ice Cream Company.*

In *Lexington Roller Mills,* 314 Ky. 111, 231 S.W.2d 491, the plaintiff's car was struck head-on by the defendant's vehicle while the plaintiff was still in the left-hand

---

1. Cf. KRS 189.340(4).

lane after having failed in an attempt to pass a truck. Plaintiff's failure to get by the truck had resulted from the fact that there was another truck in front, which she had not seen. A judgment in her favor was reversed on the ground of erroneous instructions and it was held, among other things, that the plaintiff was negligent as a matter of law because she was attempting to pass in violation of KRS 189.340(3). Again, we see nothing in that case to force a different result in this one. Had Markham's car been hit by an oncoming vehicle while he was in the northbound lane, he probably would have been held negligent as a matter of law. The difference is that in this instance the passing lane was clear; in *Lexington Roller Mills* it was not.

*Slusher,* Ky., 323 S.W.2d 870, *Clardy,* Ky., 284 S.W.2d 651, *Morrison,* Ky., 375 S.W.2d 685, and *Duncan,* Ky., 357 S.W.2d 694, are cited for their enunciation of the principle that if there are extraordinary or unusual conditions obstructing a motorist's vision he must exercise caution commensurate with the circumstances. In *Slusher* the plaintiff's automobile collided with the rear end of the defendant's truck in a heavy fog. (It was held, however, that the question of his contributory negligence should have been submitted to the jury.) In *Clardy* a coal truck collided with the rear end of a grain truck which had been stopped by its driver to inquire whether he could assist the driver of a disabled hay truck headed in the opposite direction. *Morrison* and *Duncan* also involved factual situations in which the driver of one vehicle had stopped to assist the driver of a disabled vehicle headed in the opposite direction, and a third vehicle struck one or the other. In each of those three cases there was an unusual condition, of which the oncoming motorist had ample notice. Specifically, in *Morrison* and *Duncan* it was held that if a motorist is blinded or his vision obscured by lights it is his duty to take such protective measures for his own safety as an ordinarily prudent driver would take under similar circumstances. In

none of these cases was the third driver held negligent as a matter of law, and only in *Morrison* was it held that the lookout duty should have been recited in the instructions.

In each of the cases discussed in the preceding paragraph there was an unusual condition which was either known to or observable by the approaching driver. When a man runs into an obstacle despite the existence of warning circumstances there is reason to infer that he was not keeping a lookout, or was going too fast, or did not have his vehicle under reasonable control. But when a motorist draws up to a large truck with the intention of passing it, about the best he can do is to see that the passing lane is clear; he cannot see what is happening directly in front of the truck until he moves over into the passing lane, and until he does that, ordinarily he would have no reason to anticipate an unusual condition. So, unless something happened to alert Markham before that time, not only was there no call for instructions on the duties of lookout and control, but no basis for holding him negligent as a matter of law.

■ At first impression it might appear that Markham was negligent in passing the truck after seeing its left-turn blinker signals. Regardless of what he thought, or what the customary courtesy among truck drivers may be, a turn signal can have but one legally-recognized meaning for a vehicle in motion, and that is a turn. Cf. KRS 189.380. Nevertheless, it must be remembered that Campbell denied having activated his turn signal. Accordingly, the jury was free to believe that the only signal from his truck was the momentary flashing of his brake lights as he touched his brakes before going around Groves. And whether the brake lights provided such warning of conditions ahead that Markham should not have attempted to pass was within the province of the jury to decide under the ordinary

care portion of the instruction heretofore mentioned.

In summary, what we have said thus far is that Campbell and his employers were not entitled to a directed verdict, were not entitled to an instruction on sudden emergency, and were not entitled to an instruction specifically reciting Markham's duties to keep a lookout and to have his car under reasonable control.

■ The next contention is that the trial court erred in rejecting testimony in the form of an opinion by a state trooper locating the "point of impact" and in refusing to permit the trooper's report of the accident to be read to the jury. On the latter point, no authority is cited to suggest the admissibility of such a report. It is "generally held that reports or records made by the police and other officials concerning the cause of, or responsibility for, an injury to the person or damage to property  *  *  *  are not admissible in evidence."   30 Am.Jur.2d 134 (Evidence, § 1002).

■ It has been held proper to allow an investigating officer to use the descriptive phrase "point of impact" after fully disclosing the qualifying facts on which he bases the statement, Browley v. Murkison, Ky., 282 S.W.2d 352 (1955), and in Sellers v. Cayce Mill Supply Co., Ky., 349 S.W.2d 677, 679 (1961), it was observed that perhaps the trial court had been overcautious in refusing to allow a state trooper to give an opinion as to where the impact occurred. Thus far there has been no case in which this court has found it prejudicially erroneous to exclude such an opinion, and we are not prepared to say it was prejudicial in this instance. In the first place, in order to qualify himself to give an opinion, the trooper gave the physical details upon which he based his conclusion, and even though he was not permitted to say specifically where he thought the collision occurred, the jurors could hardly have failed to grasp the import of his testimony in this

respect.   Secondly, the principal importance of the point of impact was its relationship to the no-passing zone. In his avowal the trooper placed it 75 feet north of the scratches made by Markham's car on the bridge abutment. Since, however, the court did not give any instruction with reference to the no-passing zone, and neither side asked for it or objected because it was not included, the question became immaterial.

The instruction outlining Markham's duties concluded as follows:

"If the jury shall believe from the evidence that the plaintiff negligently failed to perform either of these duties and that said failure, if any, was a proximate cause contributing to cause the accident, and that otherwise the plaintiff would not have been injured, the law is for the defendants and you should so find."

■ Appellants object to the quoted portion of the instruction on the theory that it required Markham's negligence (if any) to be *the proximate cause* of the accident in order for the jury to find against him on the ground of contributory negligence. If that were the case, the objection would be well taken. However, the instruction says *"a* proximate cause," not *"the* proximate cause." The customary and better form of contributory negligence instruction is substantially along the lines set forth in the recent case of Skees v. Whitaker, Ky., 398 S.W.2d 715, 718 (1966), and Stanley's Instructions § 112b (1967 Supp.), as follows:

"If you believe from the evidence that the plaintiff failed in any one or more of said duties and that such failure on his part, if any, contributed to or helped to bring about the collision, to such extent that otherwise it would not have occurred, then the law is for the defendant, and you shall so find."

However, the instruction as given does not, as appellants argue, convey the im-

pression that Markham's negligence must have been the sole cause or sole proximate cause in order to bar his recovery, and we do not find it misleading. Appellants seem to feel that there can be but one "proximate" cause, but any negligence, including contributory negligence, in order to have legal significance, must be a proximate causal factor in the resulting injury.

■ The last point is that the award was excessive. Markham was 28 years old at the time of the accident. The trial was held four years later. He was a band director and teacher of instrumental music in the public schools. His principal injury consisted of a comminuted fracture or shattering of the head of the humerus at the point of articulation in the right shoulder. It required open surgery to repair. Markham was hospitalized for five days and returned to work in ten days. His medical expenses amounted to $523.50. He did not suffer any loss of income and is today earning more dollars per annum, at the same occupation, than he was earning before the accident. Nonetheless, his right arm is permanently impaired to the degree of 60%, and even though this has not yet affected his earnings, there are many things both at work and at home that he cannot do, or that he cannot do as well as he did before, and he must take special exercises every day to keep his arm in working order. His physician testified that "in a shoulder that is damaged to this extent we would expect wear-and-tear arthritis and traumatic arthritis to develop over the years."

The jury awarded $1,950 for damages to Markham's automobile, $523.50 for his medical expenses, and $36,000 for "personal damage." Under the instructions it was authorized to award damages not only for impairment of his power to earn money but also for the pain and suffering he had endured and will endure in the future by reason of the injury. Although the extent of impairment to his earning power appears uncertain, there is no doubt that he will have to live out the rest of his days (an

expectancy of 40 years) with a game right arm. He will not be able to do the things other men can do, he will have to take special exercises others need not take, and it is likely that he will suffer arthritic pain where others do not have it. We think all this adds up to a very substantial damage, and we cannot find the award excessive.

The judgment is affirmed.

All concur.