Joyce D. **WOOSLEY** et al., Appellants,

v.

**CENTRAL UNIFORM RENTAL,** Appellee.

Court of Appeals of Kentucky.

Feb. 12, 1971.

D. H. Robinson, Leland Monhollan, Robinson, Rectenwald, Tackett & DeMoss, Louisville; J. Chester Porter, Givhan & Porter, Shepherdsville, for appellants.

Larry L. Johnson, William P. Swain, Boehl, Stopher, Graves & Deindoerfer, Louisville, for appellee.

PALMORE, Judge.

Early in the morning of October 18, 1968, Foster J. Woosley was found dead at the wheel of his employer's truck, which had left the highway, struck an embankment, and come to rest against a tree. There were no passengers and no eyewitnesses. A blood sample taken from the body several hours later disclosed a blood alcohol content of .25%, indicating, according to competent expert testimony, a state of "absolute drunkenness." The ensuing claim of Woosley's widow and children for the benefits provided by the workmen's compensation law (KRS 342.070) resulted in an award in their favor, from which the employer appealed to the circuit court. KRS 342.385. The widow and children now appeal to this court from a judgment of the circuit court setting aside the award and directing a dismissal of the claim.

The employer specifically pleaded as a defense that Woosley's death was caused by intoxication. The board found that the employer had not met the burden of satisfying it "that the alleged intoxication was the proximate cause of the accident." The effect of the circuit court judgment is that the evidence did meet that burden conclusively and as a matter of law, compelling the board to reject the claim.

KRS 342.015(3) provides that no compensation may be paid for injury to or death of an employe "caused by a willful, self-inflicted injury, willful misconduct or intoxication of such employe." Though it has been a part of the workmen's compensation law since the beginning (c. 33, § 3, Acts of 1916), the "intoxication" aspect of this exclusion does not appear to have been a dispositive basis for any opinion of this court denying recovery until Banks v. Department of Education, Ky., 462 S.W.2d 428 (decided January 15, 1971), and in that case it was enmeshed in a holding that by becoming intoxicated and entrusting the operation of his employer's automobile to another intoxicated person the employe had been guilty of wilful misconduct as well as a substantial departure from the course of his employment. The *Banks* case, incidentally, is distinguishable from Mason-Waller Motor Co. v. Holeman, 284 Ky. 374, 144 S.W.2d 796 (1940), in at least two respects, (1) that in *Mason-Waller Motor Co.* though intoxication appears to have been present, evidently the issue as presented was confined to whether the employe had abandoned the course of his employment in turning the car over to another driver, and (2) that in *Banks* the board itself denied the claim, whereas in *Mason-Waller Motor Co.*, the board had allowed it, and in each instance the action of the board was sustained by this court.

No case in this jurisdiction seems to have discussed the meaning of the statutory words "caused by" in the context of intoxication, though it was held in Ford Motor Co. v. Smith, 283 Ky. 795, 143 S.W. 2d 507, 509 (1940), that in the absence of a "clear showing that either the rapid driving or the drinking was the direct and proximate cause of the accident," compensation should not be denied to an employe "merely because he was operating an automobile in excess of the statutory speed limit and had taken two drinks," the car having left the highway and struck a tree.

Some statutes require that intoxication be the "sole cause" in order to bar compensation. Those which, like ours, use the words "caused by" are generally construed to mean proximate cause. Larson's Workmen's Compensation Law, § 34.33.

■ There have been decisions in other jurisdictions that when the facts disclose, in addition to the intoxication, a special source of hazard bearing upon the accident the intoxication is not the proximate cause. *Ibid.* The evidence in this case proved that the road on which the accident happened was narrow, hilly and crooked and that the weather conditions were rainy and wet. Apparently Woosley's truck skidded as he attempted to negotiate a bad curve on a hill. Nevertheless, the difficulty of driving a motor vehicle under dangerous highway conditions merely increases the likelihood that the driver's intoxication will result in an accident. Moreover, there may be more than one proximate cause, and we are not persuaded that our statute may be construed to require that intoxication be *the* proximate cause, because from the standpoint of legal causation that would really amount to *sole* cause. Cf. Campbell v. Markham, Ky., 426 S.W.2d 431, 438–439 (1968). As we construe the statute, it means that if the accident would not have happened but for the intoxication, then it was caused by intoxication. That it may have been or was caused by other things also, proximately or otherwise, is immaterial.

■ Since in the ordinary course of things a motor vehicle under the exclusive control of the driver does not run off the road if he is exercising ordinary care, the occurrence of such an event gives rise to a rebuttable presumption that it was caused by the driver's negligence. Eaton v. Swinford, Ky., 424 S.W.2d 118 (1968). Further evidence proving conclusively that the driver was intoxicated to the degree that his ability to operate a motor vehicle was "severely impaired," as in this case, certainly would enlarge the scope of that presumption to embrace the conclusion (based upon ordinary probabilities) that not only did the

accident result from bad driving, but also that the bad driving resulted from the intoxication; and in the absence of explanatory proof sufficient to rebut the presumption or reduce it to the status of a permissible inference the fact-finding agency would be compelled to find that the accident was caused by the driver's intoxication. Therefore, depending on the admissibility of the evidence relating to the blood sample, we are of the opinion that the conclusion reached by the trial court is sound and correct.

Both the board and the ciricuit court treated the result of the blood test as admissible evidence.[1] The claimants contend it was inadmissible and that the board should have sustained their motion to exclude it. Without it there would be no substantial evidence of intoxication.

The arguments against admissibility are that the taking of the blood sample was not within statutory authorization and that it was not carried out in such a manner that the analysis of its contents could be accepted as reliable.

Subsections (1) and (2) of KRS 186.565 (c. 184, Acts of 1968, eff. March 27, 1968) provide as follows:

"(1) Any person who operates a motor vehicle in this state is deemed to have given his consent to a chemical test of his blood, breath, urine or saliva for the purpose of determining the alcoholic content of his blood, if arrested for any offense arising out of acts alleged to have been committed while the person was driving or in actual physical control of a motor vehicle in this state while under the influence of intoxicating beverages. The test shall be administered at the direction of a law enforcement officer having reasonable grounds to believe the person to have been driving or in actual physical control of a motor vehicle in this state while under the influence of intoxi-

cating beverages. The law enforcement agency by which the officer is employed shall designate which of the aforesaid tests shall be administered, and provide necessary equipment.

"(2) Any person who is dead, unconscious or who is otherwise in a condition rendering him incapable of refusal, is deemed not to have withdrawn the consent provided in section one of this Act and the test may be given."

In the same legislative act the following two subsections were added to KRS 189.-520:

"(7) Only a physician, registered nurse or qualified medical technician, duly licensed in Kentucky, acting at the request of the arresting officer can withdraw any blood of any person submitting to a chemical test under this act.

"(8) The person tested shall be permitted to have a duly licensed physician of his own choosing administer a chemical test in addition to the one administered at the direction of the police officer."

Again, as in Com., Dept. of Public Safety v. Brent, Ky., 452 S.W.2d 819 (1970), the constitutionality of these provisions relating to the taking of blood samples is not challenged and we assume but do not necessarily decide it.

■ Subsection (1) of KRS 186.565 deems the operator of a motor vehicle to have given consent "if arrested." It does not purport to say that he consents if *not* arrested. Then subsection (2) says that such consent is not withdrawn by death, unconsciousness or other incapacity; but if the person who is dead, unconscious or otherwise incapacitated has not been arrested, literally there is no statutory consent to be withdrawn. So runs the argument for the claimants.

---

1. The board specifically found the evidence "sufficient to establish the integrity of the blood sample," but ruled against the employer on the issue of whether the fatal accident was caused by intoxication.

The employer contends that although KRS 186.565(1) and (2) may be somewhat ambiguous in this respect, subsection (2) evinces a clear legislative intent to permit the taking of a blood sample from a dead person without previous consent, since it is obvious that a dead man cannot be arrested. We do not think the problem is that easy. The main object of the statute is to provide an evidentiary basis for determining whether the man has committed the offense of drunk driving, and if that were its only object we could see no legitimate reason for pursuing it beyond his death except, perhaps, for the very limited purpose of protecting the arresting officer against a charge of false arrest. The driver in question having died, he could not be prosecuted and there would be no need to revoke or suspend his license. Certainly we do not have any reason to believe that the enactment of this statute was motivated to any degree by a desire on the part of the legislature to authorize discovery, by the police, of evidence that would have no purpose or legal significance except in a civil proceeding unrelated to the police powers of the government.

On the other hand, it seems to us that there are other valid reasons for securing the information made possible by the taking of a blood sample from the body of a person killed in an automobile accident. There can be no doubt that one of the major concerns and most difficult problems of law enforcement is the safety of those who use the public highways of the state. To that end, police agencies not only may but should investigate the causes of accidents on the highways within their jurisdiction. Surely such information is necessary to the development of any successful program of accident prevention. Therefore, even though a suspected driver be dead and beyond the pale of prosecution, it remains within the legitimate scope of any investigating law enforcement officer's inquiry to seek out the cause of death. And so, despite the infelicitous phraseology of KRS 186.565(1) and (2) when read in tandem, we are of the opinion that the legislature did not intend to condition the taking of a blood sample from a deceased person upon his having been placed under arrest before death.

It is not a foregone conclusion that if the statutory authorization were held invalid or inapplicable the evidence of the blood sample would have been inadmissible. The traditional common law rule is that evidence is not inadmissible merely because it was wrongfully or illegally obtained. Streipe v. Hubbuch Bros. & Wellendorf, 233 Ky. 194, 25 S.W.2d 358 (1930); 29 Am.Jur.2d 466 (Evidence, § 408). In fact, until Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), this continued to be the law of many states even in criminal cases where the evidence in question was obtained by searches and seizures violating the Fourth Amendment. See annotations at 84 A.L.R.2d 959 and 5 A.L.R.3d 670; 29 Am.Jur.2d 472 (Evidence, § 412). And in *Streipe*, supra, this court held that a human body is not a "possession" within the constitutional protection against unreasonable search and seizure.[2] It is only because we have misgivings as to the soundness of that opinion today that we choose not to rely upon it, thus reserving a reconsideration of it for some case in which it may be challenged.[3]

It has been held also in a recent case that under certain exigent circumstances in which probable cause exists a search may be constitutionally permissible without an arrest and without a warrant. John-

2. Whether the unauthorized taking of a blood sample from a dead body is a "trespass" was raised but not decided in Soard v. Rogers' Adm'r, Ky., 332 S.W. 2d 525 (1960).

3. For further discussions pertinent to the general subject see Lassoff v. Gray, 207 F.Supp. 843 (W.D.Ky.1962); Lebel v. Swincicki, 354 Mich. 427, 93 N.W.2d 281 (1958); Breithaupt v. Abram, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957); Downing v. Marlia, 82 Nev. 294, 417 P. 2d 150 (1966); and Wigmore on Evidence, § 2263 (3d ed.).

son v. Commonwealth, Ky., 443 S.W.2d 20, 23 (1969). Therefore, even if it be conceded that the next of kin should have as much protection against an intrusion upon the body of a deceased person as they would have against unreasonable searches of inanimate objects such as houses and automobiles, there still is room for an argument that the *Johnson* principle may apply. That too, however, we prefer not to decide unless and until it is adequately presented.

Shortly after the accident was discovered the sheriff and coroner of Bullitt County were called to the scene. It was necessary to call a wrecker and move the wrecked vehicle up a hill and then extricate Woosley's body through the windshield. A "6-pack" of beer from which two or three bottles had been removed was found in the truck. Both the coroner and the sheriff testified that they called for a blood sample. The sheriff later took a vial, furnished for that purpose by the Kentucky State Police, to Hardy's Funeral Home in Shepherdsville, where the body had been taken, and a specimen of blood was withdrawn from the body by Harold Hardy, a licensed embalmer and owner of the funeral home. It was delivered to the sheriff and sent to the Kentucky State Police laboratory for analysis.

The integrity of the vial in which the blood sample was placed and transmitted is not questioned. However, the syringe used to extract the specimen was one that had been left in the preparation room of the funeral home by another embalmer who customarily did the embalming work for Mr. Hardy. Ordinarily it was used for the purpose of injecting an embalming fluid into the facial tissue and would be cleansed by rinsing with hot water, but not sterilized. Mr. Hardy could not say how free of foreign material it was when he used it to withdraw the Woosley sample, testifying only that it was dry and "looked perfectly clean." It was made of clear glass. When the contents of the vial were analyzed at the police laboratory they were found to

contain, in addition to the .25% of ethyl alcohol (the major component of alcoholic beverages), a slight trace of methyl or wood alcohol, which is not a component of alcoholic beverages and probably represented a "contamination" from the syringe used by Mr. Hardy, since methyl alcohol usually is present in embalming fluids. According to the expert testimony of the chemist, the presence of this trace of methyl alcohol did not affect the validity of the test. The chemist testified also that it is not necessary for the instruments used to be sterile, but only that they be "chemically clean." There was no testimony as to whether embalming fluids contain any ethyl alcohol except that Hardy said he did not think so.

The envelope furnished by the state police for submitting blood samples bears several instructions, one of which reads, "Do not use a syringe, needle, or other instrument to procure sample if it has been sterilized with alcohol or if it has ever contained embalming materials." It was explained that these instructions had been to some degree outmoded by the use of a new piece of equipment (a grascomatisgraph) in the laboratory, but for some unaccountable reason neither counsel asked the chemist or any other witness what would be the significance of the syringe's having in fact previously contained embalming fluid. Regardless of the ease with which different types of alcohol may be separated and identified in the laboratory, what was the possibility or probability that an apparently clean and dry syringe might contain some ethyl as well as methyl alcohol, and in such quantity as to becloud the validity of the specimen for the purpose at hand? The significance of this unasked and unanswered question bears comment in reaching a conclusion that the evidence was worthy of admission.

■ The quantity of methyl alcohol discovered was 0.10 mg/ml, or .10 milligrams per mililiter. Converting the .25% ethyl alcohol content to the same basis, the quan-

tity of ethyl alcohol was 2.65 milligrams per mililiter, or 26.5 times greater than the methyl alcohol. Whereas the evidence indicates a natural and probable source of the methyl alcohol, there is none suggesting any probable source of ethyl alcohol, especially in a significant quantity, except in the blood itself. This absence of evidence suggesting a foreign source sufficiently possible or probable to justify excluding the evidence as a matter of law leads us to the conclusion that its reliability and probative value lay within the fact-finding domain of the board. See Webb v. Stone, Ky., 445 S.W.2d 842, 843 (1969).

■ With respect to the further argument that the blood sample was not taken in the manner prescribed by KRS 189.520, it is our opinion that this provision was intended for the safety and protection of the person being subjected to the test and does not apply to a dead body.

The judgment is affirmed.

All concur.